IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**STUART C. IRBY COMPANY, INC.**                                                                        **PLAINTIFF**

VS.                                               4:13-CV-00171-BRW

**BRANDON TIPTON,** *et al.*                                                                        **DEFENDANTS**

## ORDER

Pending are the Motions for Summary Judgment by Plaintiff (Doc. No. 74) and Defendants (Doc. No. 70). For the reasons set out below, Plaintiff's Motion is DENIED and Defendants' Motion is GRANTED.

**I.   BACKGROUND[1]**

Defendants Brandon Tipton, Michael Gilbert, and Steven Padgett are former employees of Treadway Electric Company, Inc. While working for Treadway, Tipton, Gilbert, and Padgett all signed compensation agreements (the Treadway Agreements) that have the following relevant clause:

> [I]f and when you leave Treadway's employ, for whatever reason, you will not compete with Treadway or its subsidiaries by soliciting or accepting business from Treadway's customers within your territory, as defined by Treadway Electric Company, for at least one (1) year after leaving; and . . . that you will not to solicit the employment of any Treadway representatives for at least one (1) year after leaving.[2]

In December 2011, Treadway entered into an Asset Purchase Agreement with Plaintiff Stuart C. Irby Company, Inc. ("Irby"), through which Irby was assigned all of Treadway's

---

[1] Unless otherwise noted, the background section is comprised of undisputed facts taken from the parties motions for summary judgment and their briefs and attachments in support of those motions.

[2] Doc. No. 74, Exs. G, H, I.

1

contractual rights.[3]  In January 2012, Irby hired Tipton, Gilbert, and Padgett.[4]  About a year later Wholesale's agent, Defendant Kurt Blumfelder, and Tipton corresponded about Tipton coming to work for Wholesale.

On March 13, 2013, Blumfelder met with Tipton, Gilbert, Padgett, and Robert Alkire (who also was employed by Irby at the time) to discuss working for Wholesale.[5]  Blumfelder met with them as a group and then individually, offering each of them a job with Wholesale.

By the evening next, Irby got wind that Alkire was leaving Irby for Wholesale.[6]  Irby's manager, Dwayne Newsome, called Tipton and asked whether he was leaving too.  Tipton was traveling with his children, and told Newsome he would call him back when he could speak in private.  Afterwards, Tipton called Blumfelder to confirm he had a job with Wholesale if he quit Irby.  Blumfelder confirmed he would, so Tipton called Newsome back and told him he was quitting.  The next day, Padgett and Gilbert also quit and went to work for Wholesale.

With Alkire, Tipton, Padgett, and Gilbert gone, Irby was left with fill-ins and two employees at the Conway branch: Steven Elliot and Jeffrey Duke.  After Tipton's exodus, he told Elliot and Duke "you have a job with Irby, and if you ever decide -- or don't like it anymore, you can give me a call, but I mean right now you have a job with Irby."[7]  Within a week, Elliot and Duke left Irby and joined Wholesale.

---

[3] Doc. No. 88.

[4] Doc. No. 74, Ex. C at 65; Ex. E at 27; Ex. F at 21.

[5] Doc. No. 74, Ex. C at 106-110.

[6] *Id.* at 119-122.

[7] *Id.* at 127.

2

Irby's Amended Complaint alleges that: (1) Tipton breached his fiduciary duty to Irby; (2) Tipton, Gilbert, and Padgett breached their Treadway Agreements; (3) Wholesale, Blumfelder, Tipton, and Wholesale's Business Development Manager Gary Cummings, tortiously interfered with the contracts Irby had with its employees; and (4) all Defendants violated the Civil RICO Act by conspiring to "assist Tipton's breach of fiduciary duties to [Irby], and assist Defendants in tortiously interfering with [Irby's] contractual relations."[8] Irby has filed a Motion for Summary Judgment on claims I, II, and III; and Defendants have filed a motion for summary judgment on all four claims.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[9] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[10]

The Court of Appeals for the Eighth Circuit has cautioned that summary judgment is an extreme remedy that should be granted only when the movant has established a right to the judgment beyond controversy.[11] Nevertheless, summary judgment promotes judicial economy by preventing trial when no genuine issue of fact remains.[12] I must view the facts in the light

---

[8] Doc. No. 31.

[9] *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56.

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[11] *Inland Oil & Transp. Co. v. United States*, 600 F.2d 725, 727 (8th Cir. 1979).

[12] *Id.* at 728.

most favorable to the party opposing the motion.[13] The Eighth Circuit has also set out the burden of the parties in connection with a summary judgment motion:

> [T]he burden on the party moving for summary judgment is only to demonstrate, *i.e.*,"[to point] out to the District Court," that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.[14]

Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[15]

## III. DISCUSSION

### A. Breach of Contract

Arkansas law is a no friend of the noncompete clause.[16] It is less fond of one made in connection with an employment contract (as opposed to one made in connection with the sale of a business).[17] A noncompete agreement that prohibits ordinary competition is not enforceable.[18] "Without statutory authorization or, some dominant policy justification, a contract in restraint of trade is unreasonable if it is based on a promise to refrain from competition that is not ancillary

---

[13] *Id.* at 727-28.

[14] *Counts v. MK-Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-74 (8th Cir. 1988) (citations omitted)).

[15] *Anderson*, 477 U.S. at 248.

[16] *HHR Ark., Inc. v. River City Contrs.*, 350 Ark. 420, 430 (2002).

[17] *Id*.

[18] *Import Motors, Inc. v. Luker*, 268 Ark. 1045, 1050–51 (1980).

to a contract of employment or to a contract for the transfer of goodwill or other property."[19] "The enforceability of a covenant not to compete depends upon its reasonableness in light of the particular facts of the case."[20] "Generally, the employer must meet these three requirements: (1) the employer has a valid interest to protect; (2) the geographic restriction is not overly broad; and (3) a reasonable time limit is given."[21]

Tipton, Gilbert, and Padgett did not breach the Treadway Agreements by accepting or soliciting business from those customers with whom Irby also does business. Although Irby was arguably assigned the Treadway Agreements, any alleged breach must have occurred within one year of December 31, 2011 -- the day on which Tipton, Gilbert, and Padgett left Treadway. Tipton, Gilbert, and Padgett were at-will employees with no guarantee they would have a job after the asset purchase. Instead, they were as free to walk away from Irby as Irby was to walk away from them; but each applied to work for Irby and, Irby, after screening the employees, hired them.[22] Because there are no allegations or facts to support a finding that anyone breached the Treadway Agreements within one year of December 31, 2011, summary judgment is appropriate.

Even assuming Irby somehow acquired the right to employ Tipton, Gilbert, and Padgett, and can stand in Treadway's stead concerning the Treadway Agreements, the noncompete clause is too broad to enforce.

---

[19] *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410, 417-418 (1999).

[20] *Rebsamen Ins. v. Milton*, 269 Ark. 737, 742 (1980).

[21] *Freeman v. Brown Hiller, Inc.*, 102 Ark. App. 76, 81 (2008).

[22] Doc. No. 74, Ex. C at 65; Ex. E at 27; Ex. F at 21.

5

First, it appears the only interest Irby seeks to protect is competition. Irby lists several customers who have done business with Wholesale after this exodus; but nothing in the record indicates those customers began doing business with Wholesale only after the exodus. It is undisputed that electrical contractors buy from both supply houses. And, although customer lists can be a valid interest to protect through a noncompete agreement,[23] Irby's customer list was public knowledge. There's a list of all licensed electricians in the State of Arkansas on the Arkansas Department of Labor's website.[24] Accordingly, as to the list of customers, Irby had little, if any, valid interest to protect.[25]

Next, the Treadway Agreements lack a reasonable geographic limitation. The agreement purports to prohibit competition by restricting the employees' abilities to solicit or accept business from "Treadway's customers within [their] territory, as defined by Treadway Electric Company." This open-ended language is similar to that previously found too broad in *Bendinger v. Marshalltown Trowell Co.*, and *HRR Arkansas, Inc. v. River City Contractors, Inc.*[26]

In *Bendinger*, an employee agreed that for two years after leaving his employer, he would not "directly or indirectly render service to a business competitor of [the employer]."[27] The

---

[23] See *Freeman*, 102 Ark. App. at 82.

[24] Arkansas Department of Labor, Electrician Roster, https://www.ark.org/rosterdl/index.php?agency=dol_electricians (accessed March 25, 2014).

[25] *Hi-Line Elec. Co. V. Moore*, 775 F.2d 996 (8th Cir. 1985) (finding that information about customers of electrical-supplies distributor was readily ascertainable and not a trade secret).

[26] *Bendinger v. Marshalltown Trowell Co.*, 338 Ark. 410 (1999); *HHR Ark., Inc. v. River City Contrs.*, 350 Ark. 420 (2002).

[27] *Bendinger*, 338 Ark. at 414.

employee went to work for a competitor and the employer argued that, because the employee's new company competed with it on a nationwide level, the restrictive covenant was reasonably limited in geographic scope.  Declining to vary the terms of the employment agreement, the Supreme Court of Arkansas held that the agreement was unreasonably broad and declined to enforce it.[28]

In *HRR Arkansas, Inc.*, an out-of-state corporation (HRR) bought an Arkansas corporation (River City) to gain presence in the central Arkansas area.[29]  The sole shareholder of River City (Megee) agreed to work for HRR and signed an agreement that purported to restrict Megee from competing with HRR "within a radius of ten (10) miles of 2824 Barrow Road, Little Rock, Arkansas, or such others established by [HRR]."[30]  The trial court found the noncompete clause unreasonable because the "such others" language in the clause left HRR in control of designating the prohibited geographic area at some future time without any assent of the employee.[31]  The Supreme Court of Arkansas affirmed, holding that the restrictive covenant lacked an enforceable geographic restriction.[32]

The language of the Treadway Agreements left Treadway in control of designating the prohibited geographic area at some future time, without any assent of the employees.  Tipton's circumstances demonstrate the unreasonableness of Treadway unilaterally defining the territory.  When Tipton signed his Treadway Agreement, he worked at the Little Rock branch.  When Irby

---

[28] *Id.*

[29] *HHR Ark., Inc.*, 350 Ark. at 430.

[30] *Id.*

[31] *Id.* at 431.

[32] *Id*.

sought to enforce the Treadway Agreement, Tipton worked at the Conway branch. That Treadway opened the Conway branch indicates that the two branches serve a different "territory." This, coupled with the public list of electrical contractors (*i.e.*, potential customers), makes the Treadway Agreements look more like an unreasonable restraint on competition than a protection of a valid interest.

As to Irby's claim that Tipton breached the Treadway Agreement by soliciting employees, nothing in the record suggests he did anything more than tell Elliot and Duke that they have a job at Irby and to call him if they ever leave. This does not rise to the level of solicitation.

"It has long been the rule that, when a covenant not to compete is too far-reaching to be valid, the court will not make a new contract for the parties."[33] I decline to do so here -- Tipton, Gilbert, and Padgett are entitled to summary judgment on this claim.

### B. Breach of Fiduciary Duty

As to Tipton's duties, Irby has alleged the following:

> [Irby] reasonably reposed confidences, dependence, and trust in Tipton. As a result of this relationship, Tipton was under a duty to act for the benefit and in the best interests of [Irby] and to refrain from acting in any way which he reasonably knew was not in [Irby's] best interest.[34]

Tipton did not owe Irby the duty alleged and thus, could not have breached it.

At-will employees in Arkansas who are not bound by an enforceable noncompete agreement are free to quit one employer for a competitor.[35] They may also announce their intent

---

[33] *Federated Mut. Ins. Co. v. Bennett*, 36 Ark. App. 99, 104-105 (1991).

[34] Doc. No. 31.

[35] *Vigoro Industries, Inc. v. Crisp*, 82 F.3d 785, 788-89 (8th Cir. 1996) (citing *Witmer v. Arkansas Dailies, Inc.*, 202 Ark. 470, 151 S.W.2d 971, 973-74 (1941)).

8

to do so to coworkers and customers of the employer.[36] But while still employed for the employer, employees owe a duty of loyalty to the employer that precludes the solicitation of coworkers and customers. "Arkansas law strikes a careful balance between an employer's right to employee loyalty, and an employee's right 'absent contrary contractual commitment' to resign and pursue his career with a competing employer."[37]

As an at-will employee, Tipton did not breach any duty to Treadway (or Irby) by entertaining, and ultimately accepting, another job offer. Likewise, there are no allegations, and nothing in the record, to support a finding that Tipton solicited customers or employees of Irby before leaving Irby. To the contrary, Irby's Amended Complaint reads, "[f]ollowing his resignation from Plaintiff's Conway Branch, Tipton also engaged in tortious interference by inducing and causing a breach of the contractual relationship Plaintiff had with its employees."[38] Accordingly, Tipton is entitled to summary judgment on this claim.

### C. Tortious Interference with a Business Contract

Nothing in the record suggests Wholesale, Blumfelder, Cummings, or Tipton caused anyone to breach a contract with Irby. Though Irby alleges Tipton, Gilbert, and Padgett breached their Treadway Agreements, as discussed above, they have not. Accordingly, Defendants are entitled to summary judgment on this claim.

### D. Civil RICO

The allegations and undisputed facts, viewed in any light, in nowise support Irby's claim under Civil RICO. Irby's Amended Complaint reads as follows:

---

[36] *Id.*

[37] *Id.*

[38] Doc. No. 31 (emphasis added).

> Defendants' scheme was calculated to and in fact did (1) assist in Tipton's breach of fiduciary duties to Plaintiff, and (2) assist Defendants in tortiously interfering with Plaintiff's lawful contractual relations.[39]

As mentioned above, Tipton did not breach any duties to Irby, and there were no contractual relations with which to interfere. The Amended Complaint goes on:

> Defendants intentionally, willfully, maliciously, and tortiously conspired among themselves to injure Plaintiff and had a meeting of the minds to accomplish a purpose that was unlawful or oppressive and/or to accomplish a purpose by unlawful, oppressive, or immoral means, which resulted in injury, damages, and loss to Plaintiff.[40]

Tipton, Garret, and Padgett wanted better jobs -- Wholesale, Blumfelder, and Cummings offered what Tipton, Garret, and Padgett considered better jobs. This does not rise to the level of a Civil RICO violation. Accordingly, Defendants are entitled to summary judgment on this claim.

### IV.   CONCLUSION

For the reasons set out above, Plaintiff's Motion for Summary Judgment is DENIED, Defendants Motion for Summary Judgment is GRANTED, and this case is DISMISSED.

IT IS SO ORDERED this 17th day of April, 2014.

/s/Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[39] Doc. No. 31.

[40] *Id.*